OLE K. NILSSEN and GEO FOUNDATION, LTD.,   )
                                         )

        Plaintiffs,                  )

                                         )       **No. 01 C 3585**

        v.                         )

                                         )       **Judge John W. Darrah**

OSRAM SYLVANIA, INC. and            )
OSRAM SYLVANIA PRODUCTS, INC.,    )

                                         )

        Defendants.                 )

## OPINION AND ORDER

Plaintiffs, Ole K. Nilssen and the GEO Foundation, Ltd., bring this action against Defendants, Osram Sylvania, Inc. and Osram Sylvania Products, Inc., for the alleged infringement of several patents. Plaintiffs originally alleged that Defendants infringed twenty-six patents. Subsequently, Plaintiffs withdrew infringement allegations for fifteen of the twenty-six patents. The eleven remaining patents in suit are United States Patent Nos. 4,857,806 (the "'806 Patent"); 5,164,637 (the "'637 Patent"); 5,233,270 (the "'270 Patent"); 5,343,123 (the "'123 Patent"); 5,402,043 (the "'043 Patent"); 5,416,386 (the "'386 Patent"); 5,432,409 (the "'409 Patent"); 5,479,074 (the "'074 Patent"); 5,481,160 (the "'160 Patent"); 5,510,680 (the "'680 Patent"); and 5,510,681 (the "'681 Patent").

Defendants answered, denying infringement, and filed a counterclaim for declaratory judgment, alleging that the patents have not been infringed by Defendants and that the patents in suit are invalid because Nilssen engaged in five types of inequitable conduct: (1) submitted misleading affidavits to the Patent and Trademark Office ("PTO"); (2) improperly claimed and paid fees as a small entity; (3) improperly claimed priority dates in several patent applications; (4) failed to

disclose litigation against Motorola, Inc. during the prosecution of patents in suit that involved the same subject matter as the patents at issue in the Motorola litigation; (5) failed to disclose material prior art references to the PTO during the prosecution of several patent applications; and (6) based on Plaintiffs' inequitable conduct, Plaintiffs' infringement action is barred by the doctrine of unclean hands.

Trial of the inequitable conduct issues was by the Court without a jury.[1] During the six-day trial, the parties presented over four hundred exhibits and testimony of seven witnesses, including four expert witnesses. The parties also submitted extensive post-trial written arguments and proposed findings of facts and conclusions of law.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The several claims of inequitable conduct present common questions of law and fact. However, some raise distinct legal and factual issues. Therefore, the Decision section of this Opinion and Order, for purposes of clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, they shall be so deemed.

---

[1]There is no right to a jury trial as to inequitable conduct. *See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993).

## FINDINGS OF FACT

### *Nilssen's Background*

Nilssen, who reside in Illinois, is a citizen of Norway. Nilssen earned a bachelors degree in electronic engineering from the University of Wisconsin in 1952 and earned a masters degree in electrical engineering from the University of Wisconsin in 1953. Nilssen was employed by Fyrnetics, Inc., at which time he met Dale Fiene. Nilssen has at least 241 U.S. Patents issued in his name. These patents relate, in large part, to electronic lighting products, such as electronic ballasts, track lighting, and compact fluorescent screw-in lamps. Nilssen holds himself out as an expert in the field of electronic ballasts.

Nilssen originally hired registered patent attorneys to draft and prosecute his patent applications. In 1983, Nilssen assumed the prosecution of his pending patent applications and began drafting and prosecuting his patent applications, *pro se*. Nilssen considers himself an expert in the prosecution of patents and prosecuting his patent applications, *pro se*, because he believes that he understands the subject matter "far better than any attorney." Nilssen estimates that as a *pro se* applicant, he has prosecuted over 1,000 patent applications. Nilssen also prosecuted, *pro se*, appeals before the Board of Patent Appeals and the Federal Circuit. As a *pro se* applicant and appellee, Nilssen regularly cites to the Manual of Patent Examining Procedure ("MPEP"), case law, and patent statutes and regulations. Nilssen prosecuted the applications for the twenty-six patents (now eleven) involved in the present lawsuit, *pro se*. Nilssen is listed on these patents as the sole inventor. With each patent application, Nilssen signed a declaration attesting, under oath, that he understood the duty to disclose material information and that he had complied with this duty. Nilssen is knowledgeable regarding patent law and patent examining procedure.

3

### (1) Affidavits Submitted to the PTO

Dale Fiene began working for Nilssen as a technical expert in the late 1980's. Fiene had met Nilssen while they both were employed by Fyrnetics. Fiene and Nilssen share an office in Barrington, Illinois. Fiene owns his own company, International Product Development, or IPD. Since its inception in 1989, Fiene has been the sole officer, shareholder, and employee of IPD. In 1989, Nilssen entered an agreement with Fiene and an agreement with IPD. The agreement with IPD provides that Nilssen would pay IPD $20,000 per quarter for various technical assistance. The agreement between Nilssen and Fiene is a contingency contract in which Nilssen agreed to pay Fiene a percentage of all the licensing revenue and litigation settlements related to Nilssen's patents up to a maximum of $500,000 (adjusted for inflation from 1989). From 1989 through 2001, Nilssen paid Fiene over $1.5 million. Nilssen continues to pay IPD $20,000 per quarter (adjusted for inflation from 1989). In addition, pursuant to a 2001 contract, Fiene receives 20 percent of all royalties Nilssen receives from the Geo Foundation.

### The '345 Patent

In June 1987, U.S. Patent No. 4,677,345 (the "'345 Patent") was issued to Nilssen.[2] Subsequently, Motorola requested that the PTO re-examine the '345 Patent. Motorola's request was granted in February 1990. In November 1990, the PTO issued an office action rejecting thirty of the forty-one claims in the '345 Patent. In January 1991, Nilssen submitted his own affidavit and an affidavit of Fiene in support of arguments for patentability in an effort to overcome the rejections by the PTO examiner. Nilssen typed Fiene's affidavit. Fiene's affidavit did not disclose that Fiene

---

[2]The '345 Patent is no longer a patent in suit but is relevant because of claimed infectious enforceability, as discussed later.

had a financial interest in Nilssen's electronic ballast patents, including the '345 Patent under re-examination, or that he had a professional relationship with Nilssen, dating back to 1978. Fiene's affidavit did include his history of working at Fyrnetics. Nilssen relied upon Fiene's affidavit in his January 1991 response to the PTO to distinguish two other patents – U.S. Patent Nos. 3,263,122 (Genuit) and 4,100,476 (Ghiringhelli) – from the '345 Patent.[3] At this time, Nilssen advised the PTO examiner: "To help analyze and evaluate the issues under dispute . . . the Patent Owner solicited the assistance of two experts in the area directly pertinent to the ['345] patent under reexamination as to the cited patents." In another submission to the PTO, Nilssen stated: "In any rational administrative procedure, an expert's (i.e., Mr. Fiene's) interpretation of facts must prevail over the interpretation of facts by a non-expert (i.e., Examiner)."

Nilssen's affidavit did not disclose that Fiene had a financial interest in Nilssen's electronic ballasts, including the '345 Patent under reexamination. Nilssen's affidavit did not include references to Nilssen's prior work with Fyrnetics. Affidavits Nilssen previously filed in 1988 and 1989 had included specific disclosure of Nilssen's relationship with Fyrnetics. Although Nilssen had met Fiene while Fiene was employed at Fyrnetics, Fiene's affidavit did not disclose this information.

*The '690 Patent*

In October 1990, Nilssen filed an application for the '690 Patent. On March 27, 1991, the PTO issued an office action rejecting all eighteen of Nilssen's original claims in the application that

---

[3]The "Description of Prior Art" in the "Background of the Invention" of the '270 and '681 Patents state: "For a description of pertinent prior art, reference is made to [the '345 Patent] to Nilssen . . ." Additional prior art referenced in the '681 and '270 Patents includes U.S. Patent Nos. 3,263,122 (Genuit) and 4,100,476 (Ghiringhelli).

issued as the '690 Patent. In April 1991, Nilssen filed a response to the PTO's rejection. Nilssen included an affidavit from Fiene, executed April 1, 1991, in support of arguments for patentability. Fiene's April 1991 affidavit did not disclose to the PTO that Fiene had a financial interest in Nilssen's electronic ballast patents, including the '690 Patent. Fiene's affidavit also failed to disclose that Fiene had a professional relationship with Nilssen, dating back to 1978. Nilssen typed Fiene's April 1991 affidavit.

### (2) Small Entity Fee Claims and Payments

A patentee is required to pay an initial fee and subsequent maintenance fees for the term of the patent to prevent expiration of the patent. The PTO allows "small entities" – defined in C.F.R. 1.9(f) as independent inventors, small business concerns, and nonprofit organizations – to pay reduced fees than that of a "large entity."

Nilssen made specific **large entity maintenance fee payments** for certain patents, as follows:

| Year | Patent(s) | Fee Paid |
|------|-----------|----------|
| 1996 | '637 | Four-year maintenance |
| 1998 | '043, '386 | Four-year maintenance |
| 1999 | '409, '074, '680, '681 | Four-year maintenance |
| 2000 | '637 | Eight-year maintenance |

Nilssen made specific **small entity claims and maintenance fee payments** for certain

patents, as follows:

| Patent | Month/Year | Small Entity Status | Small Entity Fee Paid |
|--------|-----------|---------------------|----------------------|
| '806 | February 1997<br>January 2001 | Claimed | Eight-year maintenance<br>Twelve-year maintenance |
| '270 | January 1997<br>January 2001<br>January 2005 | Claimed<br>Claimed<br>Claimed | Four-year maintenance<br>Eight-year maintenance<br>Twelve-year maintenance |
| '690 | March 1999<br>June 1999<br>March 2003 | Claimed | Eight-year maintenance<br>Twelve-year maintenance |
| '160 | June 1999<br>June 2003 | Claimed<br>Claimed | Four-year maintenance<br>Eight-year maintenance |
| '210 | August 1999<br>June 2003 | Claimed<br>Claimed | Issue fee<br>Four-year maintenance |
| '356 | November 2000<br>November 2004 | Claimed<br>Claimed | Eight-year maintenance<br>Twelve-year maintenance |
| '891 | September 2001 | Claimed | Four-year maintenance |
| '067 | February 2002<br>March 2002 | Claimed | Eight-year maintenance |
| '123 | March 2002 | Claimed | Eight-year maintenance |
| '043 | September 2002<br>October 2002 | Claimed | Eight-year maintenance |
| '386 | October 2002<br>November 2002 | Claimed | Eight-year maintenance |
| '409 | December 2002<br>January 2003 | Claimed | Eight-year maintenance |
| '074 | February 2003<br>June 2003 | Claimed | Eight-year maintenance |
| '680 | February 2003<br>October 2003 | Claimed | Eight-year maintenance |

| Patent | Month/Year | Small Entity Status | Small Entity Fee Paid |
|--------|-----------|---------------------|----------------------|
| '681 | February 2003 October 2003 | Claimed | Eight-year maintenance |
| '118 | February 2003 | Claimed | Eight-year maintenance |
| '347 | February 2003 | Claimed | Eight-year maintenance |
| '637 | May 2004 | Claimed | Twelve-year maintenance |
| '342 | August 2004 | Claimed | Twelve-year maintenance |

*The Geo Foundation*

In 1998 Nilssen established the Geo Foundation, Inc., in the Cayman Islands. The Geo Foundation holds Nilssen's patents under an exclusive license. The Geo Foundation does not conduct any business other than licensing and litigating Nilssen's patents. All of Nilssen's licensing revenues and lawsuit settlements are paid directly to the Geo Foundation. The Geo Foundation pays Nilssen 25 percent of its gross income. The Geo Foundation also pays all of the litigation costs associated with the patent lawsuits. All of the Geo Foundation's funds are held in a bank in Connecticut. The Geo Foundation has only one active director, Lars Evensen. Evensen lives in Norway and is Nilssen's nephew. Neither Nilssen nor Evensen has ever been to the Cayman Islands.

The Geo Foundation was established as a not-for-profit charitable organization. From its establishment in 1998 up until December 20, 2005, the Geo Foundation had not made a single charitable contribution. The Geo Foundation has never filed a tax return or paid any income tax.

The stated goals of the Geo Foundation, as set by Nilssen, include the "development and establishment of a totally inflation-proof, fully-backed international currency system"; sovereign jurisdiction to assure that individuals' and corporations' "productive output [cannot be] forcibly taken by some governmental body"; and maintenance of class action lawsuits against the

8

United States "seeking abolishment of the involuntary servitude to which a Small Class of high productivity U.S. Citizens (e.g., the upper 5% of all income tax payers) is presently subjected by virtue of the fact that a large part of the income of this Small Class is forcibly taken . . . and given to another very Large Class of U.S. Citizens (e.g., the lower 50% of all income tax payers . . . )."

The Geo Foundation's 1999 Overview disclosed that its goal was to preserve the wealth of the wealthy. In addition, the Geo Foundation follows the "Rose Law" – "a fact cannot be changed by giving it another name." The Geo Foundation interprets national laws and government actions under the Rose Law – "not recognizing as legitimate a government's natural tendency to legalize actions and practices . . . which are clearly illegal under more basic laws . . . for instance . . . " taxes are illegal under the Takings Clause of the U.S. Constitution.

*Patent Licenses*

Nilssen entered into an agreement, the Compact Fluorescent Lamp Agreement ("CFL Agreement"), with Philips Electronics North America Corp., effective December 7, 1995. The CFL Agreement provides, in part: "Nilssen expects to offer CFL manufacturers a preferred running royalty rate under his CFL patents for a limited period starting the first quarter of 1996. Nilssen and Philips agree that Nilssen will offer and Philips will take a standard license from Nilssen under his CFL patents . . . ." The CFL Agreement obligated Nilssen to license at least the following patents to Philips: the '806, '637, '356, '270, '067, '123, '347, '680, '681, and '201 Patents. Because Nilssen had an obligation to license to Philips, all of the patents subject to the CFL Agreement were not entitled to a small entity status and required payment of large entity fees.

Nilssen entered into a Patent License Agreement with Philips in January 1996. Philips employed more than 500 persons from December 7, 1995 to present. The Patent License Agreement

obligated Nilssen to license at least the following patents to Philips: the '806, '690, '637, '342, '356, '067, '043, '386, '409, '347, '118, '074, '160, '680, '681, '819, and '210 Patents. Because of the Patent License Agreement with Philips as to these patents, Nilssen was not entitled to claim small entity status or pay small entity fees as to these patents.

### (3) Claimed Priority Dates

A patent applicant may claim priority back from a later application to an earlier patent in order to obtain the benefit of the filing date of the earlier application. There are four requirements to claiming an earlier priority date: (1) the earlier description must have a written description of the invention and must have an enablement of the invention within it; (2) at least one of the inventors in each of the applications must be in common; (3) there must be co-pendency; and (4) there must be a cross reference of the applications, including their status as continuing, divisional or a continuation-in-part in the specification that is seeking the benefit.[4]

The '409, '160, '386, '043, '118, and '819 Patents are "children" of the '342 Patent. The '342 Patent was filed on February 25, 1992, and was issued on February 23, 1993. The '342 Patent claims to be a continuation of U.S. Patent Application No. 07/646,497, which it claims is a continuation of U.S. Patent Application No. 07/107,795, which it claims is a continuation-in-part of U.S. Patent Application No. 06/658,423, filed October 5, 1984. The '342 Patent and its parent applications do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/658,423, filed October 5, 1984. However, in the '409, '160, '386 and '043 Patents, Nilssen claims priority to U.S. Patent No. 4,184,128 ('128 Patent") to

---

[4]More detailed discussions of priority dates and of these related terms are included in the Conclusions of Law and Decision sections of this Opinion and Order.

obtain an effective filing date of March 20, 1978. For the '409, '160, '386, and '043 Patents to have this effective filing date of March 20, 1978, the parent applications of the '409, '160, '386, and '043 Patents would have to specifically reference the '128 Patent and have been copending.

Nilssen's claim of priority to the effective filing date of March 20, 1978, in the '409, '160, '386, and '043 Patents was incorrect because the respective parent applications filed between 1984 and 1992 do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/658,423, filed October 5, 1984. Nilssen's claim of priority to the effective filing date of March 20, 1978, in these patents is also incorrect because these patents rely on the incorrect assertion by Nilssen that U.S. Patent Application No. 06/658,423 is a continuation-in-part of U.S. Patent Application No. 06/555,426. U.S. Patent Application No. 06/555,426 was previously abandoned when the PTO granted Nilssen's requested file wrapper continuation on August 27, 1984. Accordingly, U.S. Patent Application No. 06/658,423, filed October 5, 1984, cannot be a continuation-in-part of U.S. Patent Application No. 06/555,426, abandoned August 27, 1984, because the two applications were not copending at any point in time.

Lawrence J. Goffney, Jr., Defendants' expert on patent issues, was: from 1996 through 1998, Acting Deputy Assistant Secretary of Commerce and United States Patent and Trademark Office Deputy Commissioner of Patents and Trademarks; from 1994 through 1998, was Assistant Commissioner for Patents; and from 1984 through 1986, a patent examiner in the PTO. Nilssen's improper claim of priority to the effective date of March 20, 1978 was material to applications issuing as the '409, '160, '386, and '043 Patents because it allowed Nilssen to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled. This is based, in part, on Goffney's testimony, which was highly credible and unimpeached.

11

The '637, '680, and '681 Patents are "children" of U.S. Patent Application No. 06/787,692. U.S. Patent Application No. 06/787,692 was filed October 15, 1985, and abandoned September 30, 1991. U.S. Patent Application No. 06/787,692 claimed to be a continuation of U.S. Patent Application No. 06/644,155, which it claimed was a continuation of U.S. Patent Application No. 06/555,426, which it claimed was a continuation of U.S. Patent Application No. 06/178,107, filed August 14, 1980. The U.S. Patent Application No. 06/787,692 and its parent applications do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/178,107, filed August 14, 1980. In the '637, '680, and '681 Patents, however, Nilssen claims priority to the '128 Patent to obtain an effective date of March 20, 1978.

The parent applications of the '637, '680, and '681 Patents would have to include a specific reference to the '128 Patent to permit the '637, '680, and '681 Patents to claim the '128 Patent priority date of March 20, 1978. Nilssen's claim of priority to the effective filing date of March 20, 1978, in the '637, '680, and '681 Patents is, therefore, incorrect because the respective patent applications filed between 1980 and 1990 do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/178,107, filed August 14, 1980. Goffney testified that, in his opinion, Nilssen's incorrect claim of priority to the effective date of March 20, 1978 was material to the prosecution of the applications issuing as the '637, '680, and '681 Patents, at least at the time he filed the applications, because it would allow Nilssen to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled. Again, this testimony was highly credible and unimpeached.

## *(4) Nondisclosure of Motorola Litigation*

On October 19, 1993, Nilssen filed a lawsuit against Motorola in the United States District Court for the Northern District of Illinois. Nilssen alleged that Motorola infringed U.S. Patent Nos. 5,191,262; 5,214,356; 5,013,974; 5,164,637; 5,047,690; and 5,185,560. Motorola denied the claims, alleging that the patents were invalid because they failed to meet the conditions of patentability and failed to comply with the requirements of 35 U.S.C. §§ 102 (novelty requirement and loss of right), 103 (obviousness), and 112 (specification requirements). On July 23, 1996, the patent claims in the Motorola lawsuit were dismissed without prejudice. On September 3, 1996, Nilssen refiled a lawsuit against Motorola, alleging infringement of the same six patents and adding infringement allegations for nine additional U.S. Patents, Nos. 4,819,146; 4,857,806; 5,189,342; 5,214,356; 5,341,067; 5,402,043; 5,416,386; 5,432,409; and 4,677,345.

Eight of the patents at issue here were pending during the Motorola litigation, as follows: the '123 Patent, filed August 24, 1992, and issued August 30, 1994; the '043 Patent, filed September 23, 1993 and issued March 28, 1995; the '386 Patent, filed May 10, 1993, and issued May 16, 1995; the '409 Patent, filed February 2, 1994, and issued July 11, 1995; the '074 Patent, filed December 21, 1992, and issued December 26, 1995; the '160 Patent, filed October 28, 1994, and issued January 2, 1996; the '680 Patent, filed December 21, 1992, and issued January 2, 1996; and the '681 Patent, filed April 15, 1994, and issued April 23, 1996.

All of Nilssen's patents represent a common-end product – electronic ballasts. The '123, '074, and '681 Patents are direct descendants of patents asserted by Nilssen in his lawsuit against Motorola. The '123 Patent is a continuation-in-part of the '637 Patent asserted in the Motorola litigation. U.S. Patent 5,185,560 ('560 Patent") is a "great grandparent" of the '123 Patent. The

'560 Patent is also a "grandparent" of the '074 Patent, related through a continuation-in-part application and a divisional application. The '560 Patent is also a "grandparent" of the '681 Patent, related through a file wrapper continuation and a continuation-in-part application.

Nilssen did not disclose the pending Motorola litigation during the prosecution of the applications that issued as the '123, '043, '386, '409, '074, '160, '680, and '681 Patents in suit.[5] The '123, '043, '386, '409, '074, '160, '680, and '681 Patents are directed towards the same subject matter as the patents asserted by Nilssen in the Motorola litigation, based in part, on the expert opinion of Goffney.

### (5) Nondisclosure of Prior Art References

U.S. Patent No. 4,251,752 ("Stolz Patent"), filed May 7, 1979, and issued February 17, 1981, constitutes prior art to the '681 Patent, pursuant to 35 U.S.C. § 102, and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '681 Patent. Nilssen had knowledge of the Stolz Patent, as demonstrated by citation to the Stolz Patent as prior art by Nilssen or patent examiners on at least twenty-five occasions in ten of Nilssen's other patent applications prior to the '681 Patent's being issued. Seven of the twenty-five references to the Stolz Patent as prior art occurred concurrently with the prosecution of the application that issued as the '681 Patent. The Stolz Patent was material to the patentability of claims in the application that issued as the '681 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claims 6, 7, and 8 of the '681 Patent. The PTO had found a substantial new question of patentability and granted reexamination

---

[5] Nor did Nilssen disclose the existence of the Motorola litigation then pending during the prosecution of the applications of the '067, '347, '118, '819, and '210 Patents, for which allegations of infringement have been withdrawn in this suit.

of the '681 Patent based, in part, on the Stolz Patent, further confirming its materiality. Nilssen failed to disclose the Stolz Patent during the application that issued as the '681 Patent.

Nilssen also failed to disclose the Stolz Patent during the prosecution of the application that issued as the '067 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '067 Patent. Nilssen had knowledge of the Stolz Patent because it was cited as prior art by Nilssen or patent examiners on at least eighteen occasions in eight of Nilssen's other patent applications before the '067 Patent was issued. The Stolz Patent was material to the patentability of claims in the application that issued as the '067 Patent because claims 4, 21 and 32 of the '067 Patent have been found to be invalid over the Stolz Patent.

U.S. Patent No. 4.045,711 ("Pitel Patent"), filed on March 19, 1976, and issued on August 30, 1997, constitutes 35 U.S.C. § 102 prior art to the '043 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '043 Patent. Nilssen had knowledge of the Pitel Patent because it was cited as prior art by Nilssen and patent examiners on at least thirty occasions in eight of Nilssen's other patent applications before the '043 Patent was issued. Three of the thirty references to the Pitel Patent as prior art occurred concurrently with the prosecution of the '043 Patent. The Pitel Patent was material to the patentability of claims in the application that issued as the '043 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claim 18 of the '043 Patent. Nilssen failed to disclose the Pitel Patent during the application that issued as the '043 Patent.

U.S. Patent No. 4,461,980 ("Nilssen Patent"), filed on August 25, 1982, and issued on July 24, 1984, constitutes 35 U.S.C. § 102 prior art to the '043 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '043 Patent. Nilssen, as the sole inventor and prosecutor of the Nilssen Patent, had knowledge of the patent. In addition, the Nilssen Patent was cited as prior art by Nilssen and patent examiners on at least sixteen occasions in eight of Nilssen's other patent applications before the '043 Patent was issued. The Nilssen Patent was material to the patentability of claims in the application that issued as the '043 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claim 18 of the '043 Patent. Nilssen failed to disclose the Nilssen Patent during the application that issued as the '043 Patent.

U.S. Patent No. 4,053,813 ("Kornrumpf Patent"), filed on March 1, 1976, and issued on October 11, 1997, constitutes 35 U.S.C. § 102 prior art to the '043 Patent. The Kornrumpf Patent was not cumulative of the prior art made of record during the prosecution of the application that issued as the '043 Patent. Nilssen had knowledge of the Kornrumpf Patent because it was cited as prior art by Nilssen and patent examiners on at least eight occasions in six of Nilssen's other patent applications before the '043 Patent was issued. Two of the eight references to the Kornrumpf Patent as prior art occurred concurrently with the prosecution of the '043 Patent. The Kornrumpf Patent is material to the patentability of the claims in the application that issued as the '043 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claim 18 of the '043 Patent. The PTO had found a substantial new question of patentability and granted reexamination of the '043 Patent based on the Kornrumpf Patent. On December 15, 2005, the PTO issued an Office Action during the reexamination of the

'043 Patent, rejecting claim 18 under 35 U.S.C. § 102(b) as anticipated by the Kornrumpf Patent. Nilssen failed to disclose the Kornrumpf Patent during the application that issued as the '043 Patent.

U.S. Patent No. 4,266,134 ("Franke Patent"), filed on December 13, 1978, and issued on May 5, 1981, constitutes 35 U.S.C. §§ 102 or 103 prior art to the '806 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '806 Patent. Nilssen had knowledge of the Franke Patent because it was cited as prior art by Nilssen or patent examiners on at least three occasions in another of Nilssen's patent applications before the '806 Patent was issued. One of the three references to the Franke Patent as prior art occurred concurrently with the prosecution of the '806 Patent. The Franke Patent was material to the patentability of claims in the application that issued as the '806 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claims 5 and 6 of the '806 Patent. Nilssen failed to disclose the Franke Patent during the application that issued as the '806 Patent.

U.S. Patent No. 4,392,087 ("Zansky Patent"), filed on November 26, 1980, and issued on July 5, 1983, constitutes 35 U.S.C. § 102 prior art to the '342 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '342 Patent. Nilssen had knowledge of the Zansky Patent because it was cited as prior art by Nilssen and patent examiners on at least twelve occasions in ten of Nilssen's other patent applications before the '342 Patent was issued. Three of the twelve references to the Zansky Patent as prior art occurred concurrently with the prosecution of the '342 Patent. The Zansky Patent was material to the patentability of claims in the application that issued as the '342 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of

17

anticipation for at least claims 3, 14 and 15 of the '342 Patent. The PTO had found a substantial new question of patentability and granted reexamination of the '342 Patent based, in part, on the Zansky Patent. Nilssen failed to disclose the Zansky Patent during the application that issued as the '342 Patent.

Nilssen kept a "special file" in his office of prior art that was frequently cited by PTO examiners. The special file included the Stolz, Pitel and Zansky Patent references.

### (6) "Unclean Hands"

On numerous occasions, Nilssen inappropriately criticized patent examiners and the Board of Appeals. For example, in his petition to the Commissioner, Appeal No. 07/107,765, Nilssen stated that he "finds subject Examiner to be not only incompetent with respect to the particular subject matter of the various claimed inventions, but also seriously lacking in the basic mental facilities needed to properly perform his assigned role."   In another petition to the Commissioner, Nilssen stated:

> a) Mr. Dixon cannot be characterized as being skilled in the arts to which subject applications pertain . . .
> b) Mr. Dixon is severely deficient in his understanding and use of reason and logic . . .
> c) Mr. Dixon has an inadequate command of the English language . . .
> d) Mr. Dixon has repeatedly shown himself to be overtly non-cooperative and non-caring.

On several occasions, the PTO returned submitted papers to Nilssen, without consideration, for Nilssen's failure to conduct business with the PTO with "Decorum and Courtesy" in violation of 37 C.F.R. 1.3.

The PTO had informed Nilssen that he had submitted defective oaths because the oath submitted failed to include the phrase "in accordance with 37 C.F.R. 1.56(a)," as required by 37 C.F.R. 1.63(b)(3). In 1988, while prosecuting the '795 Patent application, the patent examiner referred Nilssen's application to the Office of the Assistant Commissioner of Patents (also known as the "fraud squad") for "further consideration of the issues relating to the duty of disclosure." In January 1989, the Office of the Assistant Commissioner of Patents informed Nilssen that the investigation regarding the duty of disclosure issue related to the '795 Patent application was terminated because the Office of the Assistant Commissioner of Patents was no longer examining patent applications for compliance with 37 C.F.R. § 1.56.

## CONCLUSIONS OF LAW

The Court has federal jurisdiction pursuant to 28 U.S.C. § 1338(a), and venue is proper pursuant to 28 U.S.C. § 1391.

All patent applicants have an affirmative duty to prosecute patents in the PTO with candor and good faith. *See* 27 C.F.R. § 1.56(a). The duty of candor extends throughout the entire prosecution history of the patent. *See Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803 (Fed. Cir. 1991) (*Fox*). Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of "candor, good faith, and honesty." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995) (*Molins*). This conduct includes "affirmative misrepresentations of material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins*, 48 F.3d at 1178.

The inequitable conduct analysis consists of two steps: (1) a determination of whether the conduct meets a threshold level of materiality and intent to mislead and (2) a weighing of the materiality and intent in light of all of the circumstances to determine whether the applicant's conduct is so culpable to render the patent unenforceable. *See Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001) (*Boehringer*). The predicate facts must be proven by clear and convincing evidence. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed. Cir. 2003). A finding of inequitable conduct as to a single claim of a patent renders all claims of that patent unenforceable, even as to those claims not tainted by the inequitable conduct. *See Pharmacia Corp. v. Par Pharmaceutical, Inc.*, 417 F.3d 1369, 1374-75 (Fed. Cir. 2005).

Information is material under the "reasonable examiner" standard – if there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent – or under the narrower standard set forth in the amended Rule 56. *See Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309, 1314-16 (Fed. Cir. 2006) (*Digital Control*). Amended Rule 56 provides that information is "material" if:

> [I]t is not cumulative to information already of record or being made of record in the application, and
> (1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
> (i) Opposing an argument of unpatentability relied upon by the Office, or
> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b)(2004). "[T]o the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower." *Digital Control*, 437 F.3d at 1316.

20

The result of a PTO proceeding assessing patentability in light of information not previously disclosed can be of strong probative value in determining the materiality of the undisclosed information. *See Molins*, 48 F.3d at 1179. A PTO examiner need not rely on a misrepresentation in order for the misrepresentation to be material. *See Molins*, 48 F.3d at 1180.

Regarding the element of intent, direct evidence of intent to mislead or deceive is rare. Intent may be inferred from clear and convincing evidence of the surrounding circumstances. *See Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123, 1133-34 (Fed. Cir. 2006) (*Purdue*). The surrounding circumstances include the "facts and circumstances surrounding the applicant's conduct." *Molins*, 48 F.3d at 1181. However, intent cannot be inferred solely from the fact that the material was not disclosed; instead, there must be some factual basis for finding intent to mislead or deceive. *See Purdue*, 438 F.3d at 1134.

When determining intent, the court must weigh all of the evidence, including evidence of good faith. *See Purdue*, 438 F.3d at 1134. If the materiality of the undisclosed information is relatively low, there is less basis to infer intent from materiality alone. On the other hand, if the undisclosed information is highly material, there can be an inference of the requisite intent to mislead or deceive. *See Purdue*, 438 F.3d at 1134.

"[A] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox*, 922 F.2d at 804. A patent that issues from a continuation or divisional application may be held unenforceable where (1) the applicant engaged in inequitable conduct with respect to the prosecution of an earlier related application in the chain leading to the challenged patent and (2) the inequitable conduct relates to the asserted claims of that patent. *See Semiconductor Energy Lab. v. Samsung Electronics Co.*,

21

24 F. Supp. 2d 537, 543-44 (E.D. Va. 1998), *aff'd on other grounds* 204 F.3d 1368 (Fed. Cir. 2000) (*Semiconductor*); *eSpeed, Inc. v. Brokertec USA*, 417 F. Supp. 2d 580, 595 (D. Del. 2006) (*eSpeed*). However, the mere occurrence of inequitable conduct in connection with an application in a chain of applications is not sufficient to invalidate a patent issued as a result of a later application in that chain; instead, the earlier inequitable conduct in the chain must be related to the targeted claims of the ultimately issued patents sought to be enforced. *See Semiconductor*, 24 F. Supp. 2d at 543. Generally, mere similarity in subject matter, mere citation to the unenforceable patent, and sharing a parent application are insufficient to invalidate a patent issued from a chain of applications in which inequitable conduct has been found as to an application within that chain. *See Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1331-32 (Fed. Cir. 2004) (*Baxter*); *Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1021-22 (N.D. Cal. 2004) (*Hoffman-La Roche*).

Inequitable conduct can be cured by an applicant by: (1) expressly advising the PTO of the misrepresentation's existence, (2) advising the PTO of what the actual facts are and making it clear that further examination in light thereof may be required if any PTO action has been based on the misrepresentation, and (3) establishing patentability on the basis of the factually accurate record. *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1572 (Fed. Cir. 1983). Curing inequitable conduct cannot be made through manipulation of the patent prosecution procedures, such as amending or cancelling claims or filing continuation and divisional applications. *See Semiconductor*, 24 F. Supp. 2d at 544-45.

The doctrine of unclean hands can apply where a plaintiff engages in misconduct related to a patent at issue. *See Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245-46 (1933) (*Keystone*); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990)

(*Consolidated*). Under the doctrine of unclean hands, inequitable conduct can render all patent claims having an "immediate and necessary relation" to that conduct unenforceable as to a single patent or to a series of related patents. *See Keystone*, 290 U.S. at 245-46; *Consolidated*, 910 F.2d at 812.

## DECISION

### *(1) Inequitable Conduct Based on Fiene Affidavit*

Patent examiners have broad authority to request information they deem relevant to the issue of patentability. *See Ferring B.V. v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1187 (Fed. Cir. 2006) (*Ferring*). "Given the *ex parte* nature of proceedings before the PTO, it is especially important that the examiner has all the information needed to determine whether and to what extent he should rely on declarations presented by the applicant." *Ferring*, 437 F.3d at 1187.

PTO examiners are specifically informed that affidavits and declarations are to be scrutinized closely and the facts weighed with care, including the affiant's or declarant's interest in the outcome of the application. *See* MPEP § 716.01(c); *Ferring*, 437 F.3d at 1187. A declarant's prior or present relationship with the patent application may be material, and failure to disclose that relationship may constitute inequitable conduct. *See Ferring*, 437 F.3d at 1187; *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1581-82 (Fed. Cir. 1996) (*Refac*); *Paragon Podiatry Lab., Inc. v. KLM Labs, Inc.*, 984 F.2d 1182, 1191-92 (Fed. Cir. 1993). A declarant's relationship with the applicant is material if: (1) the declarant's views on the underlying issue are material and (2) the relationship to the applicant is significant. *Ferring*, 437 F.3d at 1188. Generally, "[a]ffidavits are inherently material"; and the "affirmative act of submitting an affidavit must be construed as being intended to be relied upon." *Refac*, 81 F.3d at 1583.

23

The question of intent is directed at the applicant's intent, not the intent of the declarant. *See*

*Ferring*, 437 F.3d at 1191. Multiple omissions of past relationships heighten the seriousness of the

conduct. *See Ferring*, 437 F.3d at 1194.

Nilssen knowingly submitted Fiene's affidavits in response to the PTO's reexamination of

the '345 Patent in an attempt to address the examiner's rejection of certain claims. Nilssen

knowingly submitted Fiene's affidavit when addressing the PTO's rejection of claims within the

'690 Patent application. Fiene's declarations in the affidavit were highly material to the

reexamination of the '345 Patent, and a reasonable patent examiner would have considered the

information important. Fiene's declarations in the affidavit were highly material to the '690 Patent

application, and a reasonable patent examiner would have considered the information important.

Nilssen and Fiene had a significant relationship – personal, professional, and financial – when the

affidavits were prepared and submitted. On more than one occasion, Nilssen knowingly failed to

inform the PTO of this significant relationship and took active steps to conceal that relationship, *i.e.*,

removing his history of employment at Fyrnetics, which could have linked Nilssen and Fiene.

Nilssen's testimony to the contrary was not credible, and the evidence showed that Nilssen intended

to mislead the PTO.[6] The level of materiality and Nilssen's intent in light of all of the circumstances

establish that Nilssen engaged in inequitable conduct during the '345 Patent reexamination and '690

Patent application by clear and convincing evidence to render the patents unenforceable.

---

[6]Nilssen originally argued at trial that the Nilssen/Fien1e relationship was readily
apparent to the PTO based on the inclusion with the affidavit of Fiene's telephone number
because the last digit is only two numbers away from Nilssen's telephone number (phone
numbers with the same prefix ending in 5617 and 5615), which was also disclosed in the same
filing. It was later developed at trial that Fiene's and Nilssen's phone numbers appeared in these
papers sixteen pages apart. Nilssen has apparently abandoned this argument.

However, the '345 Patent is no longer at issue in this case. Osram seeks to have the '270 and '681 Patents, which are still at issue, invalidated under the doctrine of infectious unenforceability, arguing that the reference to the '345 Patent in the description of prior art in the '270 and '681 Patents is sufficiently related to render the '270 and '681 Patent unenforceable. In support of its argument, Osram argues that Nilssen's proposed standard of "immediate and necessary relation" required for infectious unenforceability has not been adopted by the Federal Circuit. However, while the "immediate and necessary relation" standard has not been "adopted" by the Federal Circuit for purposes of infectious unenforceability, because it has not decided the issue, the Federal Circuit has referred to that standard. *See Consolidated Aluminum Corp. v. Forseco Intl' Ltd.*, 910 F.2d 804, 810-11 (Fed. Cir. 1990). Furthermore, the Federal Circuit has specifically held that "where claims are subsequently separated from those tainted by inequitable conduct through a divisional application, and where the issued claims have no relation to the omitted prior art, the patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application." *Baxter*, 149 F.3d at 1332.

Here, the application that issued as the '345 Patent was a divisional application,[7] and the primary relationship Osram identifies between the '345 and the '270 and '681 Patents is the reference of the '345 Patent in those patents and sharing a common parent application. The mere reference to the '345 Patent in the description of prior art in the '270 and '681 Patents and the sharing of a common parent application and applicant does not demonstrate sufficient relatedness to the '345 Patent to render the '270 or '681 Patents unenforceable under the doctrine of infectious unenforceability. *See Baxter*, 149 F.3d at 1331-32; *Hoffma-La Roche*, 319 F. Supp. 2d at 1021-22.

---

[7]This term is discussed more fully later in this Opinion and Order.

### (2) Inequitable Conduct Based on Small Entity Status Claims and Fees

As noted above, a patentee is required to pay an initial issue fee and subsequent maintenance fees every four years for the term of the patent to prevent expiration of the patent. 35 U.S.C. § 41. Following increases in these fees, Congress – concerned that the increased fees would be overly burdensome to individuals, non-for-profit organizations, and small businesses– provided a discount in the amount of fees for these "small entities." *See Ulead Sys., Inc. v. Lex Computer & Mgt. Corp.*, 351 F.3d 1139, 1142 (Fed. Cir. 2003) (*Ulead*).

A small entity is defined as "an independent inventor, a small business concern, or a non-profit organization." 37 C.F.R. § 1.27(a). An "independent inventor" is defined as:

> any inventor who (1) has not assigned, granted, conveyed, or licensed, and (2) is under no obligation under contract or law to assign, grant convey, or license, any rights in the invention to any person who could not otherwise be classified as an independent inventor if that person had made the invention, or to any concern which would not qualify as a small business concern or a nonprofit organization under this section."

37 C.F.R. § 1.27(a)(1).

A "small business concern" is defined as:

> one whose number of employees, including those of its affiliates, does not exceed 500 persons and which has not assigned, granted, conveyed, or licensed, and is under no obligation under contract or law to assign, grant, convey, license, any rights in the invention to any person who could be classified as an independent inventor if that person had made the invention, or to any concern which would not qualify as a small business concern or a nonprofit organization under this section.

37 C.F.R. § 1.9(d).

A "nonprofit organization," up until August 2001, was defined, in pertinent part, as:

> (2) an organization of the type described in Section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) and exempt from taxation under section 510(a) of the Internal Revenue Code (26 U.S.C. 501(a)); (3) any nonprofit scientific or educational organization qualified under a nonprofit organization statute of a state in this country (35 U.S.C. 201(j)); or (4) any nonprofit organization under paragraphs (e)(2) or (3) of those sections if it were located in this country.

37 C.F.R. § 127(a)(3).

In August 2001, the definition of a nonprofit organization, in pertinent part, was amended

to:

> any nonprofit organization that: (i) Has not assigned, granted, conveyed, or licensed, and is under no obligation under contract or law to assign, grant, convey, or license, any rights in the invention to any person, concern, or organization which would not qualify as a person, small business concern, or a nonprofit organization; and (ii) Is either: (A) A university or other institution of higher education located in any country; (B) An organization of the type described in section 501(c)(3) of the Internal Revenue Code . . . ; (C) Any nonprofit scientific or educational organization qualified under a nonprofit organization statute of a state of this country (35 U.S.C. 201(i)); or (D) Any nonprofit organization located in a foreign country which would qualify as a nonprofit organization under paragraphs (a)(3)(ii)(B) of this section or (a)(3)(ii)(c) of this section if it were located in this country.

37 C.F.R. § 1.27(a)(3). Any party making an assertion of small entity status must make a declaration

claiming small entity status. *See* 37 C.F.R. § 1.27(c); MPEP § 509.03; MPEP § 2250.

False declarations and improper fee payments may constitute inequitable conduct. *See*

*Ulead*, 351 F.3d at 1145-46. A false declaration of small entity status is material as a matter of law

because the PTO's acceptance of a declaration and the resulting reduced fees is material to the

survival of the patent. *See Ulead*, 351 F.3d at 1146. In addition, Section 1.28(c) allows a patentee

27

to correct an error in making a small entity payment if the status as a small entity is established in good faith and the fees as a small entity are paid in good faith. *See* 37 C.F.R. § 1.28(c). While the PTO is not required to make an inquiry into whether the patentee has established good faith as a condition of accepting a late payment, if a patentee seeks to correct an incorrect payment of fees as a small entity pursuant to Section 1.28(c) without good faith, the patentee may be found to have engaged in inequitable conduct. *See Ulead*, 351 F.3d at 1149-50.

Effective December 7, 1995, Nilssen entered into the CFL Agreement; at which time Nilssen was not entitled to, but did, claim small entity status and paid small entity maintenance fees as to the '806, '637, '270, 123, '680, and '681 Patents. Effective January 1, 1996, Nilssen entered into a Patent License Agreement with Philips; at which time Nilssen was not entitled to, but did, claim small entity status and paid small entity maintenance fees as to the '806, '637, '043, '386, '409, '074, '160, '680, and '681 Patents. From December 1995 to the time of trial, Nilssen made at least twenty-seven improper payments to the PTO in both the eleven patents in suit and nine patents Nilssen withdrew from the case. In this same time frame, Nilssen submitted at least fifteen declarations to the PTO claiming small entity status, including eight patents in suit and seven withdrawn patents.

Nilssen acted with intent to mislead in declaring small entity status and in making small entity payments. Nilssen made multiple false declarations and small entity payments over several years. Nilssen's testimony as to why he believed he was entitled to small entity declarations and payments was not credible. Nilssen, a self-proclaimed expert in patent prosecution, had years of experience prosecuting and maintaining his patents. Nilssen regularly completed the required forms

affirmatively declaring his status as a small entity. These forms, entitled "Verified Statement (Declaration) Claiming Small Entity Status," were signed by Nilssen under oath. The "Verified Statement" put Nilssen on notice of the specific C.F.R. provisions governing small entity status.

Nilssen's assertion that he did not read the applicable C.F.R. provisions is not credible. The evidence showed that Nilssen was knowledgeable of and understood patent law and the MPEP during the prosecution of his patents. During his testimony, Nilssen also admitted that he read the MPEP section that incorporated the very C.F.R. provisions at issue. Nilssen, unconvincingly, testified during the trial that his actions this regard should be excused and that he erred in good faith because he did not understand certain regulations.

Nilssen also asserted that he "justifiably believed he could make small entity payments on any patents licensed to Geo" because the MPEP prior to August 2001 "implied" that Nilssen was entitled to pay small entity fees for all such patents. This version specifically stated, under the heading "Transfer of Rights" the following:

> The payment of reduced fees under 35 U.S.C. 41 is limited to those situations in which all rights in the invention are owned by small entities . . . To do so otherwise would be clearly contrary to the intended purpose of the legislation which contains no indication that fees are to be reduced in circumstances where rights are owned by non-small entities.

Nilssen claims, as evidence of his perceived ambiguity of this section, the August 2001 amendment now makes it clear that he was required to make large entity payments; however, he asserts he was unaware of the amendment until recently. Nilssen's testimony that he was knowledgeable of a specific provision in the MPEP (the pre-August 2001 version), which permitted him to draw an interpretation of the law he believes is favorable to him, but ignorant of the August 2001 amendment is not credible. Moreover, his unbelievable explanation belies his assertion that

his improper small entity claims were the result of a good faith mistake. Essentially, Nilssen is claiming that he ceased being informed on the requirements to qualify for small entity fees at a time when, coincidentally, the law was changed to his apparent detriment.[8]

Nilssen's unconvincing reliance on the GEO Foundation to excuse his declarations and small entity payments is also unavailing.[9] As discussed above, Nilssen was required to pay large entity fees for all patents licensed to the Geo Foundation because the Geo Foundation itself licensed the patents to large entities. Furthermore, the Geo Foundation's lack of any charitable activity, as well as its announced goals and mission statement, set by Nilssen himself, demonstrates that the Geo Foundation could not properly be classified as a non-for-profit corporation.

Lastly, Nilssen's argument that he would not have intentionally paid small entity fees because the amount of money he was saving was too small relative to what he might lose if his patents were declared unenforceable is without merit.[10] However, considering only the portion of Nilssen's

---

[8]*See* MPEP § 2550 ("37 C.F.R. 1.366(f) serves as a reminder to patentees of the necessity to check for the loss of small entity status prior to paying each maintenance fee on a patent. This is also a requirement of 37 C.F.R. 1.28(b). The notification of any change in status resulting in loss of entitlement to small entity status must be filed in a patent prior to paying, or at the time of paying, the earliest maintenance fee due after the date on which status as a small entity is no longer appropriate.").

[9]At trial, Nilssen argued that he was merely relying on his advice of counsel in believing that the GEO Foundation was a non-for-profit organization, relieving Nilssen from paying large entity fees. Nilssen did not present this defense until the time of trial and withheld discovery from his counsel based on attorney-client privilege. Furthermore, Nilssen's counsel's opinions as to the Geo Foundation's non-for-profit status were formed from the information provided by Nilssen. For example, Nilssen's counsel wrongly assumed that Nilssen was not part of the Geo Foundation's formation and that the Geo Foundation had engaged in charitable activities.

[10]People are dishonest and break the law even when small amounts of money are at stake. *See DaimlerChrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054, 1062 (S.D. Cal. 2003) ("Why [patentee] and his agents would put the enforceability of patents licensed for millions of dollars at risk to save a few thousand dollars in PTO fees is beyond reason. Yet, the

portfolio licensed to Philips, Nilssen would owe in excess of $200,000 in underpayments, a significant amount of money. Nilssen also admittedly opposes government fees, taxes, and the present legal system which, further demonstrates an incentive to avoid payment.

Based on clear and convincing evidence, in light of the materiality and considering the totality of circumstances supporting Nilssen's obvious intent to mislead, Nilssen's declarations of small entity status and small entity payments render Nilssen's repeated misconduct so culpable as to render the patents at issue unenforceable.

### (3) Inequitable Conduct Based on Priority Misclaims

False statements regarding an application priority date may constitute inequitable conduct. *See Li Second Family L.P. v. Toshiba Corp.*, 231 F.3d 1373, 1378-79 (Fed. Cir. 200) (*Li*); *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1575-76 (Fed. Cir. 1985) (*KangaROOS*). "Because the effective filing date of each claim in a patent application determines which references are available as prior art for purposes of §§ 102 and 103, information regarding the effective date is of the utmost importance to an examiner. Consequently, an applicant's misrepresentation that he is entitled to the benefit of an earlier filing date is highly material." *Li*, 231 F.3d at 1379-80 (inequitable conduct where applicant made affirmative assertions of an effective filing date without informing the PTO that the Examiner and Board of Appeals had rejected the same arguments that had been made earlier with respect to the prosecution of an earlier patent). Inequitable conduct has not been found by merely "claiming priority to an earlier patent where the specifications, but not the claims, of the later patents are supported by the earlier patent." *Boehringer*, 237 F.3d at 1367

---

evidence overwhelmingly supports the inference that they did so, and common experience confirms that the world has no shortage of individuals who commit irrational and self-destructive acts.").

(finding no inequitable conduct by applicant that incorrectly claimed priority to an earlier patent but did not actively mislead the examiner).

For the period ending August 2001, 35 U.S.C. § 120 provided:

> An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if files [*sic*] before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain specific reference to the earlier filed application.

35 U.S.C. § 120.

Beginning August 2001, 35 U.S.C. § 120 states:

> An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application. No application shall be entitled to the benefit of an earlier filed application under this section unless an amendment containing the specific reference to the earlier filed application is submitted at such time during the pendency of the application as required by the Director. The Director may consider the failure to submit such an amendment within that time period as a waiver of any benefit under this section. The Director may establish procedures, including the payment of a surcharge, to accept an unintentionally delayed submission of an amendment under this section.

35 U.S.C. § 120.

Four conditions exist to receive the benefit of an earlier filing date under Section 120:

> (1) The second application (which is called a continuing application) must be an application for a patent for an invention which is also disclosed in the first application (the parent or original application); the disclosure of the invention in the first application and in the second application must be sufficient to comply with the requirements of the first paragraph of 35 U.S.C. 112 . . . . (2) The continuing application must be copending with the first application or with an application similarly entitled to the benefit of the filing date of the first application. (3) The continuing application must contain a specific reference to the prior application(s) in the specification . . . (4) The continuing application must be 'filed by the same inventor' as in the prior application . . . .

MPEP § 210.11.

"Copendency is defined in the clause that requires that the second application must be filed before (a) the patenting, or (b) the abandonment of, or (c) the termination of proceedings in the first application. MPEP § 201.11. "If the first application is abandoned, the second application must be filed before the abandonment in order for it to be copending with the first." MPEP § 201.11. "Abandonment" refers to "express abandonment." MPEP § 201.11. The specific reference to the first application, which is required by the third requirement, "should appear as the first sentence of the specification following the title preferably as a separate paragraph (37 C.F.R. 1.78(a))." MPEP § 201.11.

"A continuation is a second application for the same invention claimed in a prior application and filed before the original becomes abandoned." MPEP § 201.07. "A continuation-in-part is an application filed during the lifetime of an earlier application by the same applicant, repeating some

substantial portion or all of the earlier application and adding subject matter not disclosed in the said earlier case." MPEP § 201.08. Section 201.11 of the MPEP provides:

> Any claim in a continuation-in-part application which is directed solely to the subject matter adequately disclosed under 35 U.S.C. 112 in the parent application is entitled to the benefit of the filing date of the parent application. However, if a claim in a continuation-in-part application recites a feature which is not disclosed or adequately supported by a proper disclosure under Section 35 U.S.C. 112 in the parent application, but which was first introduced or adequately supported in the continuation-in-part application, such a claim is entitled to the filing date of the continuation-in-part application.

MPEP § 201.08, *citing In re Van Lagenhoven*, 458 F.2d 132, at 136, 173 USPQ 426 at 429 (CCPA 1972) and *Chromalloy American Corp. v. Alloy Surfaces Co., Inc.*, 339 F. Supp. 859, 874, 173 USPQ 295 at 306 (D. Del. 1972).

Section 201.11 of the MPEP provides, in pertinent part:

> A claim in a subsequently filed application that relies on a combination of prior applications may not be entitled to the benefit of an earlier filing date under 35 U.S.C. 120 since 35 U.S.C. 120 requires that the earlier filed application contain a disclosure which complies with 25 U.S.C. 112, first paragraph for each claim in the subsequently filed application.

MPEP § 201.11, *citing Studiengesellschaft Kohle m.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1564, 42 USPQ2d 1674 (Fed. Cir. 1997).

A divisional application is a "later application for a distinct or independent invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier application or parent application." MPEP § 201.06(a). A file wrapper continuation is a "continuation, continuation-in-part, or divisional application which uses the specification and drawings from a prior application to be abandoned [and] filed before the payment of the issue fee,

abandonment of, or termination of proceedings on a prior claim . . . ." MPEP 201.06(b). The filing of a request for a continuing application pursuant to the file wrapper continuing procedure is "considered to be a request to expressly abandon the prior application as of the filing date granted the continuing application." MPEP § 201.06(b). "Use of the FWC procedure will automatically result in express abandonment of the prior application as of the filing date accorded the continuation, continuation-in-part, or divisional application." MPEP § 201.06(b). Further, the "filing of a request for a continuing application under 37 C.F.R. 1.62(g) is considered to be a request to expressly abandon the prior application as of the filing date granted the continuing application." MPEP § 201 § 711.01.

Nilssen's claim of priority to the effective date of March 20, 1978, in the '409, '160,' 386, and '043 Patents were false because the copendency and cross-reference requirements were not satisfied. Likewise, Nilssen's claim of priority to the effective date of March 20, 1978, in the '637, '680, and '681 Patents were false because the cross-reference requirement was not satisfied.

These false claims of priority dates were highly material because they allowed Nilssen to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled. *See Li*, 231 F.3d at 1379-80.

Furthermore, Nilssen intended to mislead the PTO by incorrectly claiming priority dates. The '409, '160, '386, and '043 Patents are all children of the '342 Patent. From 1984 to 1992, the '342 Patent and its parent applications did not claim priority to any patents or parent applications before October 5, 1984. On February 22, 1993, Nilssen filed Application No. 08/020,696 as a continuation of the '342 Patent application. However, this time, Nilssen claimed priority back to March 20, 1978. Just days before this new claim of priority, on February 18, 1993, Nilssen sent a letter to his licensee,

Advance Transformer Co., disclosing his intent to obtain patent protection on the "Epsilon Project."

In the letter, Nilssen stated:

> A patent application aimed at attaining patent protection for various features of the initial Epsi-type Electronic Ballast has been prepared and will be filed shortly. This patent application will be a Continuation-In-Part of currently pending patent application Serial No. 07/840,52[8] filed 02/25/92.
>
> Since many of the constituent parts of the Epsi-type Inverter/Ballast design may be considered as representing known art, it may not be possible to attain effective basic patent protection on all the important features of the Epsi-type Electronic Ballast.

The Application No. 07/840,528, referred to in the letter, is the same application that issued as the '342 Patent.

As indicated in his letter to Advance, Nilssen filed Application No. 08/020,696 (whose file wrapper continuation issued as the '160 Patent) four days later as a continuation-in-part of Application No. 07/840,528. Unlike Application No. 07/840,528, and all other preceding applications, Nilssen claimed priority back to 1978. The priority misclaims in the '409, '160, '386, and '043 Patents all followed. The Advance letter demonstrates that Nilssen intentionally misclaimed priority in these patents to avoid known prior art and to obtain "effective basic patent protection." Nilssen's testimony to the contrary was unpersuasive.

Nilssen engaged in similar conduct as to the '637, '680, and '681 Patents. These patents are all children of Application No. 06/787,692. Between August 1980 and July 1991, Application No. 06/787,692 and all its preceding applications claimed priority to dates no earlier than August 14, 1980. On August 9, 1991, Nilssen filed Application No. 07/743,216, issuing as the '637 Patent, and, for the first time, claimed priority back to March 18, 1978. The priority misclaims in the '680 and '681 Patents followed.

36

Again, shortly before the new priority claim date, on March 6, 1991, Nilssen sent a letter to Advance regarding the "Omega Ballast." Nilssen wrote, in pertinent part:

> However, I also mentioned to you that I may not be able to attain effective patent coverage on the Omega Ballast; which presents me with a dilemma.
>
> This dilemma relates to the fact that Advance is free to cancel its License Agreement with me at any time after June 30, 1993. Thus, if it should turn out that the Omega Ballast were to lack effective patent protection, I would have to recognize that Advance might indeed cancel its License Agreement with me while proceeding to make and sell the Omega Ballast.

The priority misclaims in the '637, '680, and '681 Patents all followed. This Advance letter demonstrates that Nilssen intentionally misclaimed priority in these patents to claim an earlier effective date to assure that Advance could not cancel its License Agreement. Nilssen's testimony to the contrary was not credible.

Based on clear and convincing evidence, in light of the materiality and the totality of circumstances as to Nilssen's intent to mislead, Nilssen's false claims of priority dates render Nilssen's repeated misconduct so culpable as to render the '409, '160, '386, '043, '637, '680, and '681 Patents unenforceable.

### (4) Inequitable Conduct Based on Failure to Disclose Litigation

Section 2001.06(c) of the MPEP provides:

> Where the subject matter for which a patent is being sought is, or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the Patent and Trademark Office; such as, for example, evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of 'fraud', inequitable conduct' or violation of duty of disclosure. Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents, and testimony.

37

MPEP § 2001.06(c). Failure to disclose related litigation may constitute inequitable conduct. *See Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1255 (Fed. Cir. 1997) (*Critikon*); *Nisus Corp. v. Perma-Chink Sys., Inc.* 421 F. Supp. 2d 1084, 1104 (E.D Tenn. 2006) (*Nisus*). "'Related litigation' is *per se* material information covered by the duty of disclosure." *Nisus*, 421 F. Supp. 2d at 1104. "It is axiomatic that '[c]lose cases should be resolved by disclosure, not unilaterally by applicant.'" *Critikon*, 120 F.3d at 1257, *quoting LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066 (Fed. Cir. 1992).

Ongoing litigation is material if the patent involved in the litigation shares the same specification and discloses the same subject matter as the pending patent. Materiality of ongoing litigation is "obvious" if it challenged the validity and enforceability of the subject matter of the pending application. *See ICU Medical, Inc. v. B. Braun Medical, Inc.*, 2005 WL 588341 at * 15 (N.D. Ill. March 14, 2005). When addressing "intent" for failing to disclose related litigation, the Federal Circuit has held:

> No single factor or combination of factors can be said always to require an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

*Critikon*, 120 F.3d at 1257.

The '123, '043, '386, '409, '074, '160, '680, and '681 Patents disclose the same subject matter as the patents asserted by Nilssen in the Motorola litigation. Nilssen was aware of the pending Motorola litigation during the prosecution of the '123, '043, '386, '409, '074, '160, '680, and '681 Patents. Nilssen's failure to disclose the Motorola litigation was highly material to the

prosecution of the applications that issued as the '123, '043, '386, '409, '074, '160, '680, and '681 Patents. Nilssen's testimony that he was unaware of a duty to disclose the Motorola litigation was not credible. Nilssen intended to mislead the PTO by failing to disclose the ongoing Motorola litigation and did not do so in good faith. Based on clear and convincing evidence, in light of the materiality and considering the totality of circumstances reflecting Nilssen's intent to mislead, Nilssen's failure to disclose the pending Motorola litigation is so culpable as to render the '123, '043, '386, '409, '074, '160, '680, and '681 Patents unenforceable.

### (5) Inequitable Conduct Based on Failure to Disclose Prior Art

Inequitable conduct can arise from the failure to disclose prior art. *See Molins*, 48 F.3d at 1178. To prevail on a charge of inequitable conduct for failure to disclose prior art, the defendant must demonstrate "materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead." *Molins*, 48 F.3d at 1178. A reference may be material even though the claims of an application are patentable over that reference. *See Molins*, 48 F.3d at 1179.

The Stolz Patent constitutes prior art to the '681 and '067 Patents. The Stolz Patent was highly material to the '681 and '067 Patents. Nilssen had knowledge of the Stolz Patent and of its materiality. Nilssen failed to disclose the Stolz Patent with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary was not credible. In light of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the Stolz Patent constitutes inequitable conduct and conduct of a degree to render the '681 and '067 Patents unenforceable.

The Pitel, Nilssen and Kornrumpf Patents constitute prior art to the '043 Patent. The Pitel, Nilssen and Kornrumpf Patents were highly material to the ''043 Patent. Nilssen had knowledge of the Pitel, Nilssen and Kornrumpf Patents and of their materiality. Nilssen failed to disclose the Pitel, Nilssen and Kornrumpf Patents with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary was not credible. In light of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the Pitel, Nilssen and Kornrumpf Patents constitutes inequitable conduct of a degree to render the '043 Patent unenforceable.

The Franke Patent constitutes prior art to the '806 Patent. The Franke Patent was highly material to the '806 Patent. Nilssen had knowledge of the Franke Patent and of its materiality. Nilssen failed to disclose the Franke Patent with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary was not credible. In light of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the Franke Patent constitutes inequitable conduct of a degree to render the '806 Patent unenforceable.

The Zansky Patent constitutes prior art to the '342 Patent. The Zansky Patent was highly material to the '342 Patent. Nilssen had knowledge of the Zansky Patent and of its materiality. Nilssen failed to disclose the Zansky Patent with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary was not credible. Based on clear and convincing evidence, in light of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the Zansky Patent constitutes inequitable conduct to a degree to render the '342 Patent unenforceable.

However, the descendant relationship of the '123, '409, '160, '386, and '043 Patents to the '342 Patent and the common drawings among them does not demonstrate sufficient relatedness to the '342 Patent to render the '123, '409, '160, '386, and '043 Patents unenforceable under the doctrine of infectious unenforceability. Mere similarity in subject matter and sharing a parent application are insufficient to invalidate a patent issued from a chain of applications in which inequitable conduct has been found as to an application within that chain. *See Baxter*, 149 F.3d at 1331-32; *Hoffman-La Roche*, 319 F. Supp. 2d at 1021-22.

### *(6) Unclean Hands*

Lastly, Defendants seek to have each of the related patents in suit held unenforceable under the doctrine of unclean hands based on the inequitable conduct that directly renders the patents in suit unenforceable. While the above findings demonstrate that Nilssen engaged in a pattern of inequitable conduct over an extended period of time, Defendants have not demonstrated by clear and convincing evidence that the inequitable conduct engaged in by Nilssen that directly renders certain patents unenforceable had an immediate and necessary relation to other related patents to render the other patents unenforceable under the doctrine of unclean hands. *See Baxter*, 149 F.3d at 1331-32; *Hoffman-La Roche*, 319 F. Supp. 2d at 1021-22.

### CONCLUSION

For the foregoing reasons, Defendants have demonstrated, by clear and convincing evidence, that Nilssen engaged in inequitable conduct and that such conduct renders the remaining eleven patents at issue unenforceable. Judgment is entered in favor of Defendants and against Plaintiffs.

Dated: 6/28/06

JOHN W. DARRAH
United States District Court Judge

41